UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BERNARD FRYSHMAN, PhD et al., ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES COMMISSION FOR THE ) <br> PRESERVATION OF AMERICA'S ) <br> HERITAGE ABROAD ) <br> ) <br> Defendant. ) <br> ) | Case No. 18-cv-02632 (APM) |

## MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiffs in this case, Dr. Bernard Fryshman and Mr. Boruch Pines, seek to compel the United States Commission for the Preservation of America's Heritage Abroad ("Commission") to prevent the Lithuanian government from building a convention center and concert hall on a historic Jewish cemetery located in Lithuania's capital, Vilnius. The Commission has moved to dismiss the case for lack of standing and failure to state a claim under the Administrative Procedure Act. In the alternative, the Commission asserts it is entitled to summary judgment on Plaintiffs' claims.

The court concludes that Plaintiffs lack standing because they have not plausibly shown that their injuries are caused by the Commission's inaction, or that a favorable decision is likely to redress their harms. In addition, and for the sake of comprehensiveness, the court further holds that Plaintiffs have failed to identify a "discrete agency action" that the Commission is "required to take" sufficient to compel agency action under the Administrative Procedure Act. Because the

court grants the Commission's Motion to Dismiss, it does not reach the Commission's alternate Motion for Summary Judgment.

## II. BACKGROUND

### A. The Commission

Observing that the "fabric of a society is strengthened by visible reminders of the historical roots of the society," Congress established the Commission in 1985 to "encourage the preservation and protection of the cemeteries, monuments, and historic buildings associated with the foreign heritage of United States citizens." Pub. L. 99–83, § 1303(a), 99 Stat. 190, 280 (1985) (codified at 54 U.S.C. § 312301 *et seq.*). The Commission consists of 21 members appointed by the President of the United States. 54 U.S.C. § 31203(b). It has three duties:

> (1) [I]dentify and publish a list of those cemeteries, monuments, and historic buildings located abroad which are associated with the foreign heritage of United States citizens from eastern and central Europe, particularly those cemeteries, monuments, and buildings which are in danger of deterioration or destruction;
>
> (2) [E]ncourage the preservation and protection of such cemeteries, monuments, and historic buildings by obtaining, in cooperation with the Department of State, assurances from foreign governments that the cemeteries, monuments, and buildings will be preserved and protected; and
>
> (3) [P]repare and disseminate reports on the condition of and the progress toward preserving and protecting such cemeteries, monuments, and historic buildings.

*Id.* § 312304.

### B. The Šnipiškės Cemetery

The cemetery that is the subject of this action is located in the Šnipiškės neighborhood of Vilnius. The cemetery was established in the fifteenth century and holds the remains of thousands of Lithuanian Jews. Compl., ECF No. 1, ¶ 11 [hereinafter Compl.]. The Nazis seized the cemetery

2

during World War II. Later, it came under the control of the Soviet Union, which removed gravestones and erected a sports hall on the grounds. Compl. ¶ 12.

In 2015, Lithuania announced plans to develop the currently abandoned sports hall into a concert hall and convention center. Compl. ¶ 15. Lithuania made this announcement despite the fact that it had executed an agreement with the Commission in 2002—titled Agreement on the Protection and Preservation of Certain Cultural Properties between the United States and Lithuania [hereinafter the 2002 Agreement]—in which it committed to "take appropriate steps to protect and preserve" cemeteries and other culturally significant sites. Compl. ¶ 13.

According to the Commission, it has taken multiple actions to secure preservation of the Šnipiškės cemetery. *See* Gov't Mem. in Supp. of Mot. to Dismiss or Summ. J., ECF No. 8, at 2–3 [hereinafter Gov't Mot.]. Namely, in January 2018, Commission Chairman Paul Packer met with the Lithuanian Ambassador to the United States to discuss the Commission's opposition to the cemetery's development. *See* Gov't Mot., Decl. of Paul Packer, ECF No. 8-1, ¶ 7 [hereinafter Packer Decl.]. Mr. Packer also made several visits to the Šnipiškės cemetery during which he met with the Mayor of Vilnius and other local officials and worked with them to develop plans to preserve and commemorate the site. Packer Decl. ¶¶ 8–9, 12. Mr. Packer then sent a letter to the Mayor of Vilnius in August 2018, which memorialized the commitments the City had made to protect the site. *Id.* ¶ 10; *see also id.*, Gov't Exhibits, ECF No. 9-2, at B [hereinafter Gov't Ex.]. The Mayor responded in a letter dated September 27, 2018, affirming the City's commitment to preserving the Šnipiškės cemetery but clarifying that the sports hall was under the jurisdiction of a Lithuanian government institution, not the City of Vilnius. *See* Gov't Ex. D. Accordingly, the Mayor suggested that various preservation measures the Commission had requested—including the recovery of human remains, containment of the new development within the existing confines

of the old sports hall, and a prohibition on plumbing and electrical work requiring excavation—were beyond the City's control. *Id.*

Plaintiffs do not dispute the occurrence of any of these actions taken by the Commission, *see* Pls.' Mem. of P&A in Opp'n to Gov't Mot., ECF No. 12 [hereinafter Opp'n Mem.], at 14–17, but they contend that because the development of the sports hall falls under the national Lithuanian government's jurisdiction, the "Commission and Vilnius [have done] nothing to protect the cemetery from the impending desecration," *id.* at 16. To the contrary, Plaintiffs assert, the Commission has "remained publicly silent about the [cemetery's] development plans, without so much as sending a letter to Lithuania's government opposing the project," *id.* at 2; *see also* Compl. ¶ 17, and its "silence has been interpreted by Lithuania as the assent of the United States to those plans," Compl. ¶ 17. Unless the Commission "immediately take[s] steps to protect the cemetery," Plaintiffs fear that "construction on the cemetery grounds is likely to begin imminently." *Id.* ¶ 18.

### C. Plaintiffs

Mr. Fryshman is an orthodox Jew and executive vice president of the Association of Advanced Rabbinical and Talmudic Schools. *Id.* ¶ 3. He believes that a Jewish cemetery's land is sacred and owned communally by all Jewish people, and that to disturb the remains of the dead is a form of sacrilege. *Id.* For Mr. Pines, the development of the Šnipiškės cemetery is personal; he is a descendant of Jews buried in the cemetery, and he is deeply offended by the planned development. *Id.* ¶ 4.

### D. Procedural History

Plaintiffs filed the present Complaint on November 15, 2018. They contend that the Commission's "failure to take steps to preserve and protect the Jewish cemetery in Vilnius" violates the Commission's duty to "'obtain[] . . . assurances from foreign governments' that sites

4

like the [Šnipiškės] cemetery are preserved and protected." Compl. ¶ 20 (quoting 54 U.S.C. § 312304(a)(2)). Plaintiffs seek a court order (1) declaring that the Commission's "failure to act" violates the Administrative Procedure Act ("APA") and the agency's organic statute, and (2) compelling the agency to "immediately take reasonable steps to obtain the assurances that the law requires." *Id.* at 7.

On February 25, 2019, the Commission moved to dismiss the case under Federal Rule of Civil Procedure ("Rule") 12(b)(1) for lack of standing and Rule 12(b)(6) for failure to state a claim under the APA. Gov't Mot. at 1. In the alternative, the Commission seeks summary judgment on the ground that it has fulfilled its statutory duties with respect to the cemetery. *Id.*

## III. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility" that the defendant has acted unlawfully and that that unlawful action—or inaction as the case may be—has injured the plaintiff in such a way that can be redressed by a favorable decision of the court. *Id.* at 678. At the motion to dismiss stage, the court must accept as true Plaintiffs' well-pleaded factual contentions and draw all reasonable inferences therefrom, but it need not accept thread-bare recitals of the elements of standing or legal conclusions couched as factual averments. *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).

5

## IV.     DISCUSSION

### A.     Plaintiffs Lack Standing

The court begins, as it must, with Plaintiffs' standing. *See West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017) ("The Constitution limits [the court's] 'judicial Power' to 'Cases' and 'Controversies,' and there is no justiciable case or controversy unless the plaintiff has standing." (quoting U.S. Const. art. III, § 2)). A plaintiff in federal court bears the burden of showing that she meets the "irreducible constitutional minimum" of Article III standing: (1) injury in fact, (2) causation, and (3) redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). To establish standing at the motion to dismiss stage, the plaintiff "must state a plausible claim that [she has] suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (quoting *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015)). To meet this burden, the "plaintiff 'must allege facts from which it reasonably could be inferred that . . . there is a substantial probability that . . . if the court affords the relief requested, the asserted [injury] will be removed.'" *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 944 (D.C. Cir. 2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 504 (1975), *abrogated on other grounds by Perry Capital LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017).

Plaintiffs maintain that, if carried out, the Lithuanian government's planned development of the Šnipiškės cemetery would be "deeply offensive" and deprive them of their communal interest in the land. *See* Compl. ¶¶ 3–4. In particular, Plaintiff Boruch Pines is a descendant of Jews buried in the cemetery, and he asserts that development of the cemetery would cause him significant distress. *Id.* ¶ 4; Opp'n Mem. at 4. The Commission has caused this harm, Plaintiffs say, by "remain[ing] silent in the face" of the ongoing development plans, which Lithuania has

6

allegedly interpreted "as the assent of the United States to those plans." Compl. ¶ 17. According to Plaintiffs, a court order compelling the Commission to "demand that Lithuania take action" to protect the imperiled cemetery is substantially likely to redress their harms. Opp'n Mem. at 8, 10–11.

Assuming without deciding that the future desecration of the Šnipiškės cemetery amounts to a cognizable, personal injury in fact, Plaintiffs nevertheless lack standing because they have not plausibly alleged that the Commission's inaction caused their injury or that a favorable decision from this court is likely to remedy the harm. When a plaintiff's alleged injuries arise from the government's failure to act with respect to a third party—in this case, a foreign sovereign, Lithuania—standing is not precluded, but it is ordinarily "substantially more difficult" to establish. *Lujan*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)). In such instances, causation and redressability "depend[] on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (opinion of Kennedy, J.). The plaintiff bears the burden of plausibly "showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *National Wrestling*, 366 F.3d at 938 (quoting *Lujan*, 504 U.S. at 562). Plaintiffs have not met their burden here.

Plaintiffs' theory of causation falls short because it is "purely speculative" that the Commission's alleged inaction has caused the Lithuanian government to proceed with its development plans. *Id*. Critically, Plaintiffs offer no factual support for their theory that the Lithuanian government has interpreted the Commission's alleged silence as acceptance of the development and desecration of the cemetery. They appear to infer that because the Commission

7

entered into the 2002 Agreement with Lithuania, its purported failure to expressly communicate "formal opposition" to the development of the Šnipiškės cemetery "is being taken as silent acquiescence." *See* Opp'n Mem., Decl. of Bernard Fryshman, ECF No. 13-2 [hereinafter Fryshman Decl.], ¶ 13. But they identify no facts that support this supposition. Just the opposite, the existence of the 2002 Agreement—in which the Lithuanian government guaranteed to the Commission that it would "take appropriate steps to protect and preserve" cemeteries and other culturally significant sites, Compl. ¶ 13—would seem to put the Lithuanian government on notice that the Commission *does not* approve of the cemetery's destruction. This is especially so given the Chairman Packer's recent efforts to communicate the Commission's specific objections to the development plans, including meeting the Lithuanian ambassador, visiting the cemetery, and developing plans with the Mayor of Vilnius to preserve and protect the cemetery. *See generally* Packer Decl.; Opp'n Mem. at 14–17 (acknowledging these actions). The fact is that Lithuania is simply not bound to accept the Commission's recommendations, and the Commission's alleged failure to take make sufficient efforts to secure the cemetery's protection simply cannot be said to be causing Lithuania to proceed with its development plans. *See NRDC v. EPA*, 902 F.2d 962, 975–76 (D.C. Cir. 1990) (finding that the "causal relationship" between the Environmental Protection Agency's failure to issue updated pollution control technique information to states and the plaintiff's anticipated injury—states' adoption of needlessly stringent control techniques—was too "attenuated" to support standing where it was "not even clear that states [were] bound to use the information" and "the *choice* of control techniques [was] within the state[s'] discretion" (emphasis in original)), *opinion vacated in part*, 921 F.2d 326 (D.C. Cir. 1991); *cf. Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council*, 589 F.3d 458, 468 (1st Cir. 2009) (applicant for federal permit had standing to challenge state agency's inaction on certifying whether project was

8

consistent with state's coastal resources program because state's inaction had a "determinative or coercive effect" on the federal permitting agency (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)).

Atop this wobbly causal foundation, Plaintiffs unsuccessfully attempt to stack their redressability argument. "[B]ecause Lithuania has interpreted the Commission's silence about the cemetery as assent to its plans," Plaintiffs insist that "it is reasonable to infer that an authoritative statement opposing the project on behalf of the United States would be particularly effective." Opp'n Mem. at 8. Possibly, but possibly not. Lithuania is a sovereign nation, and Plaintiffs concede that the Commission "lack[s] the authority to protect the cemetery" because "only Lithuania has regulatory control over the cemetery." *Id.* at 5. The mere possibility that Lithuania *might* accede to the Commission's request falls far short of showing there is a "substantial probability" that the relief sought will remedy the injury asserted. *National Wrestling*, 366 F.3d at 944; *see Arpaio*, 797 F.3d at 21 ("When considering any chain of allegations for standing purposes, we may reject as overly speculative those links which are predictions of future events[,] especially future actions to be taken by third parties . . . ." (internal quotations and parentheses omitted)).

Binding case law from the D.C. Circuit and persuasive authority from this District Court compel this conclusion. For instance, in *Talenti v. Clinton*, the D.C. Circuit held that a naturalized U.S. citizen whose foreign property was unlawfully expropriated by the Italian government lacked standing to compel the United States to withhold federal aid from Italy because of the "considerable uncertainty as to whether such action would aid plaintiff in collecting [his property] or would tend to drive [the foreign government] into even greater intransigence." 102 F.3d 573, 578 (D.C. Cir. 1996) (second alteration in original) (quoting *Aerotrade, Inc. v. Agency for Int'l*

*Dev.*, 387 F. Supp. 974, 975 (D.D.C. 1974)). Likewise, in *Nyambal v. Mnuchin*, the court held that a former employee of the International Monetary Fund (IMF) who had allegedly been fired after acting as a whistleblower lacked standing to force the Secretary of the Treasury to require the IMF to implement whistleblower protections. 245 F. Supp. 3d 217, 224 (D.D.C. 2017), *aff'd*, 2017 WL 5664980 (D.C. Cir. Nov. 8, 2017). Though the law requires that the Secretary "shall seek to ensure that the IMF is implementing best practices for the protection of whistleblowers from retaliation," Consolidated Appropriations Act of 2012, Pub. L. No. 112–74, div. I, tit. VII, § 7071(c), 125 Stat. 786, 1255, the court nevertheless held that it was "sheer speculation" as to whether the IMF would implement the requested relief. *Nyambal*, 245 F. Supp. 3d at 224. In this case, as in *Talenti* and *Nyambal*, Plaintiffs have not shown that it is *likely*—as opposed to merely conjectural—that a sovereign foreign nation would exercise its "broad and legitimate discretion," *ASARCO*, 490 U.S. at 615, to grant them the relief they seek.

Plaintiffs respond that, in the past, the Commission has convinced foreign governments to prevent the desecration of cemeteries, citing as evidence one instance in which the Commission successfully appealed to Poland's prime minister to remove a brothel from a Jewish cemetery. Opp'n Mem. at 9. While an agency's consistent track record of successfully influencing third parties in a way that would redress a plaintiff's harms may be sufficient for standing purposes, such cases generally involve a more robust record of past successes and a bigger carrot or stick. For instance, in *Japan Whaling Association v. American Cetacean Society*, the plaintiffs sought to compel the Secretary of Commerce to certify that Japan was conducting its fishing operations in violation of international whaling agreements. 478 U.S. 221, 228 (1986). The plaintiffs' harm was redressable even though the Secretary was not the source of the harm because the certification carried with it the threat of significant, mandatory sanctions and there was record evidence that

prior certifications had consistently caused offending nations to conform their fishing operations. *See id.* at 225–26; *see also Talenti*, 102 F.3d at 578 (discussing *Japan Whaling*); *Animal Welfare Inst. v. Kreps*, 561 F.2d 1002, 1009–10 (D.C. Cir. 1977) (holding that an order compelling the U.S. government to enforce a moratorium on the importation of baby seal skins would likely cause South Africa to harm fewer seals). Here, by contrast, a single instance of the Commission's success in Poland does not make it "substantially likely" that the Commission would be able to obtain similar success in Lithuania, especially when it lacks any specific statutory power to incentivize or coerce the Lithuanian government.

Plaintiffs also cite the 2002 Agreement as evidence that Lithuania would "likely be receptive" to the Commission's demands that it protect the Šnipiškės cemetery. Opp'n Mem. at 7–8. If anything, the Lithuanian government's persistence in developing the cemetery notwithstanding the 2002 Agreement casts further doubt on the Commission's ability to prevent the development. Likewise, the fact that Lithuania is a "small country that depends on the protection of United States against regional threats" and a NATO ally, *id.* at 9, "only further demonstrates that numerous factors" and independent actors outside the Commission's control would play a role in the Lithuanian government's decision whether or not to develop the cemetery, *see Siegel v. United States Dep't of Treasury*, 304 F. Supp. 3d 45, 55 (D.D.C. 2018) (holding that plaintiffs whose property was seized by Israeli settlors lacked standing to enjoin the United States from providing aid to Israel when the "path from ending U.S. aid to the return of the plaintiffs' property . . . involved numerous third parties," whose actions and reactions were impossible to predict (cleaned up)). Federal courts are simply "not well-suited to draw the types of inferences regarding foreign affairs and international responses to U.S. policy that Plaintiffs' theory of causation posits." *Siegel*, 304 F. Supp. 3d at 55.

Plaintiffs counter that Congress has adjudged that the Commission's mandate to obtain assurances from foreign governments is an effective way to accomplish the goal of preserving U.S. heritage abroad and suggest that this court should not second-guess that decision. *See* Opp'n Mem. at 7. If Congress believed that the Commission would be impotent, Plaintiffs suggest, "it would never have created" the Commission. *Id.* But "one need not adopt the view that a challenged government policy is totally ineffectual to find that the likelihood of redress is too speculative to confer standing upon a plaintiff." *National Wrestling*, 366 F.3d at 943. In *Nyambal*, for instance, Congress surely thought that directing the Secretary of the Treasury to "seek to ensure that the IMF is implementing best practices for the protection of whistleblowers from retaliation" would help prevent the general sort of harm Mr. Nyambal experienced. 245 F. Supp. 3d at 223 (internal quotations marks omitted). But that did not make the possibility of Mr. Nyambal himself obtaining relief from the IMF more than speculative. *Id.* at 224. So, too, here. Any remedy that the Commission could obtain is purely conjectural, and "[w]hen conjecture is necessary, redressability is lacking." *West v. Lynch*, 845 F.3d at 1237. Accordingly, Plaintiffs lack standing to assert their APA claim.

B.     **Plaintiffs Fail to State a Claim under the APA**

Defendants also have moved to dismiss this case for failure to state a claim under the APA. Though Plaintiffs' lack of standing disposes of this case, the court also addresses this additional argument for the sake of completeness.

Because Plaintiffs are challenging the Commission's alleged inaction, section 706(1) of the APA applies, under which a court may "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Section 706(1) codifies the common law writ of mandamus and empowers a court only to compel an agency "to perform a ministerial or non-

discretionary act" amounting to "a specific, unequivocal command." *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 61 (2004) (internal quotation marks omitted); *see also Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016). "[A] claim under [section] 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton*, 542 U.S. at 64 (emphases in original). These limitations "rule[] out judicial direction of even discrete agency action that is not demanded by law." *Id.* at 65. "Thus, when an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be." *Id.*

In *Norton*, the Supreme Court clarified the limitations on section 706(1) claims. The plaintiffs there sought a court order compelling the Bureau of Land Management to cease allowing off-road vehicles on certain public lands known as "wilderness study areas," claiming that by permitting such use of the lands, the agency had violated its mandate to "continue to manage [wilderness study areas] . . . in a manner so as not to impair the suitability of such areas for preservation." *Norton*, 542 U.S. at 60–61, 65 (quoting 43 U.S.C. § 1782(c)). Though the Court agreed that "[s]ection 1782(c) is mandatory as to the object to be achieved," it nevertheless held the BLM could not be ordered to prohibit all off-road vehicles. *Id.* at 66. The Court explained that the statute "assuredly does not mandate, with the clarity necessary to support judicial action under [section] 706(1), the total exclusion" of off-road vehicles, instead giving the BLM "a great deal of discretion" in deciding how to achieve the statute's non-impairment mandate. *Id.* at 66. In the absence of any specific statutory prohibition on off-road vehicles, the Court concluded that it could not enter "a general order compelling compliance with" the agency's broader non-impairment mandate, noting that "[g]eneral deficiencies in compliance . . . lack the specificity

13

requisite for agency action." *Id*. To hold otherwise, the Court explained, would force the "supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management." *Id.* at 66–67.

Plaintiffs in this case point to two of the Commission's duties that they argue compel the relief they seek: "[T]o 'identify' sites in need of protection and to 'obtain[] . . . assurances from foreign governments' that the sites it identified will be protected." Opp'n Mem. at 12 (second alteration in original) (quoting 54 U.S.C. §§ 312304(1), (2)). They acknowledge that the Commission has "a significant amount of discretion" as to how it goes about complying with its statutory mandate to seek assurances from foreign governments but contend that the Commission's mandate is nevertheless sufficiently discrete to support judicial relief. Opp'n Mem. at 12–14 (internal quotation marks omitted).

Unfortunately for Plaintiffs, they cannot escape the limitations outlined in *Norton*. The Commission's enabling statute creates a mandatory, *general* duty for the Commission to identify sites associated with the foreign heritage of U.S. citizens and seek assurances from foreign governments that they will be protected. However, it says nothing of the particular cemetery in question, or how the Commission must exercise its significant "discretion with respect to strategically engaging foreign governments regarding particular sites." Gov't Mot. at 11. In other words, the statute does not mandate the action that Plaintiffs seek "with the clarity necessary to support judicial action under [section] 706(1)." *Norton*, 542 U.S. at 66; *see also In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig.*, 751 F.3d 629, 634 (D.C. Cir. 2014) (denying request to force the Internal Revenue Service to issue a "specific refund procedure" for unlawfully collected telephone exercise taxes because "[e]ven if the code did require some excise-tax-specific procedure, it affords the Secretary of the Treasury great discretion to design the details"); *cf. Meina*

14

*Xie v. Kerry*, 780 F.3d 405, 408 (D.C. Cir. 2015) (holding that a statutory provision entitled plaintiff to 706(1) relief because it "establish[ed] a specific principle of temporal priority that clearly reins in the agency's discretion").

Plaintiffs attempt to navigate around this shortcoming by asking the court for a general directive ordering the Commission to "take reasonable steps to obtain the assurances that the law requires." Compl. at 7; *see also* Opp'n Mem. at 14 (asking the court to "order the Commission to comply with its mandate to obtain assurances without specifying how those assurances must be obtained"). But that request founders on the same rocks as the *Norton* plaintiffs' request. Just as the plaintiffs in *Norton* sought to force the BLM to prohibit off-road vehicles with a general order compelling the BLM to comply with its broader non-impairment mandate, Plaintiffs here seek a "general order compelling compliance with [the Commission's] mandate, without suggesting any particular manner of compliance." 542 U.S. at 66. But if "courts were empowered to enter general orders compelling compliance with broad statutory mandates . . . it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management." *Id.* at 66–67. Such judicial oversight "over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA." *Id.* at 67.

What's more, the Commission has undeniably acted to identify sites associated with the foreign heritage of the United States and obtain assurances from foreign governments to preserve and protect those sites. Indeed, Plaintiffs acknowledge that the Commission obtained assurances from Lithuania in 2002 that it would "take appropriate steps to protect and preserve" cemeteries and other culturally significant sites, Compl. ¶ 13, and they do not dispute that Chairman Packer met with the Lithuanian Ambassador to express the Commission's opposition to the development

15

of the Šnipiškės cemetery, and that Mayor of Vilnius sent the Commission a letter agreeing to take certain actions to preserve and commemorate the cemetery, *see* Opp'n Mem. at 14–17. Nevertheless, they contend that the Commission has "remained silent in the face of Lithuania's plans" to develop the cemetery, Compl. ¶ 17, because it has not "so much as sen[t] a letter to Lithuania's government opposing the project," or otherwise expressed its public opposition, Opp'n Mem. at 2. Nothing in the Commission's statutory mandate, however, requires that the Commission send such a letter or express its opposition publicly (as opposed to privately through diplomacy). Therefore, Plaintiffs' claim that the Commission has "unlawfully withheld" such actions must fail. *See Davidson v. United States Dep't of State*, 113 F. Supp. 3d 183, 191 (D.D.C. 2015) (rejecting section 706(1) claim where government had already acted and had no statutory requirement to act differently), *aff'd*, 728 Fed. App'x 7 (D.C. Cir. 2018).

Finally, Plaintiffs make much of the fact that the Commission's organic statute uses the word "shall," which, they say, demonstrates that the relief they seek is mandatory, as opposed to discretionary. To be sure, courts have found that agencies cannot be compelled to act when the relevant statutory language is permissive, not mandatory. *See, e.g.*, *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 671–72 (D.C. Cir. 2016) (rejecting a section 706(1) challenge where the operative portion of the statute provided only that agency "may" perform the plaintiffs' requested action). But the mere presence of the word "shall" does not conversely mean a court can *a fortiori* compel an agency to act. *See Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 26 (D.D.C. 2017) (holding that a statutory directive that agency "shall continue to review" its policies and "revise them as necessary" lacked the "degree of mandatoriness needed to give rise to a claim under 5 U.S.C. § 706(1)"). Words in a statute must be read in context. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007). The statute at issue here says nothing as

16

to how or in what manner the Commission should prioritize its resources in fulfilling its general mandate. *See People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1090, 1098–99 (D.C. Cir. 2015) (statute requiring an agency to "promulgate standards to govern the humane handling . . . of animals by dealers, research facilities, and exhibitors" could not be used to compel the agency to apply its general animal welfare regulations to the handling of birds because the agency had discretion not to enforce those regulations while it developed separate, bird-specific regulations). Because Plaintiffs seek such a court order, they cannot make out a claim under section 706(1).[1]

## V. CONCLUSION

For the foregoing reasons, the Court grants the Commission's Motion to Dismiss, ECF No. 8. A final order accompanies this Memorandum Opinion.

Dated: October 22, 2019

Amit P. Mehta
United States District Court Judge

---

[1] To obtain relief under the APA, a party must also "clear the hurdle of [section] 701(a)," which prohibits judicial review of agency action "to the extent that . . . agency action is committed to agency discretion by law." *Heckler v. Chaney*, 470 U.S. 821, 828 (1985) (internal quotation marks omitted). Section 701(a) precludes relief when there is "no meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 830. The court is skeptical whether there are such standards here; however, because Plaintiffs have not identified a discrete responsibility sufficient to support relief under 5 U.S.C. § 706(1), the court need not decide whether section 701(a) separately bars relief. *See PETA*, 797 F.3d at 1097 (noting that section 701(a) is not jurisdictional, so a court may dispose of a case on other grounds).